941 F.2d 910
 57 Empl. Prac. Dec. P 41,056
 CORAL CONSTRUCTION COMPANY, an Oregon corporation; Oregon
Columbia Chapter of the Associated General
Contractors of America, Inc., an Oregon
non-profit corporation,
Plaintiffs-Appellants,
v.
KING COUNTY, a legal subdivision of the State of Washington,
Defendant-Appellee.
 No. 90-35066.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 4, 1990.
Decided Aug. 8, 1991.
 
 John F. Bradach, Charles F. Adams, Stoel, Rives, Boley, Jones & Grey, Portland, Ore., for plaintiffs-appellants.
 Jack G. Johnson, Deputy Pros. Atty., King County, Seattle, Wash., for defendant-appellee.
 Patricia S. Rose, Martha E. Raymond, Seattle, Wash., Samuel L. Walters, Baltimore, Md., for amici curiae Northwest Women's Law Center and N.A.A.C.P.
 William Bradford Reynolds, Thomas G. Olp, Ross & Hardies, Washington, D.C., for amici curiae Associated General Contractors of America, Inc.
 Ronald A. Zumbrun, John H. Findley, Sacramento, Cal., for amici curiae Pacific Legal Foundation.
 Appeal from the United States District Court for the Western District of Washington.
 Before SKOPIL, O'SCANNLAIN and FERNANDEZ, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether King County's Minority- and Women-Owned Business Enterprise set-aside program for public contract awards violates the equal protection clause of the fourteenth amendment.
 
 
 2
 * In 1981, King County, Washington (which encompasses the city of Seattle) implemented a program establishing a preference for the use of minority-owned businesses (MBEs) and women-owned businesses (WBEs)[1] in letting county contracts or subcontracts.[2] See King County, Wash., Code ch. 4.18. Following the Supreme Court's decision in City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), King County amended the MWBE program in an effort to comply with the dictates of Croson. See King County, Wash., Ordinance 8937 (May 1, 1989). It is under this amended version of the ordinance that the events at issue here transpired.[3]
 
 
 3
 Under the County's program as amended, a "minority business" is one certified by the State of Washington as being legitimately owned and controlled by a minority person or persons. King County, Wash., Code §§ 4.18.010(S). The term "minority" includes blacks, Hispanics, Asian-Americans, American Indians, and Alaskan natives. Id. at § 4.18.010(T). A "women's business" similarly must be certified by the state. Id. at § 4.18.010(HH).
 
 
 4
 The MWBE program provides two methods by which MWBEs may receive preferences in bidding on county contracts. For county contracts of $10,000 or less, the "percentage preference method" gives a contract bidder who is an MWBE or will use MWBEs on the project a preference if its bid is within five percent of the lowest bid. See id. at § 4.18.060(A)(1). For county contracts of more than $10,000, the "subcontractor set-aside method" applies, under which the successful contractor must use MWBEs for a prescribed percentage of the work performed on the contract. See id. at § 4.18.060(A)(2). The actual percentages of required MWBE participation are individually determined on an ad hoc basis, according to the availability of qualified MWBEs. See id. at § 4.18.060(A)(2)(a).
 
 
 5
 The program permits a reduction in the amount of set-aside levels for a given contract if it is not feasible to meet higher levels, qualified MWBEs are unavailable, or MWBE price quotes are not competitive. See id. at § 4.18.060(B). Likewise, the percentage preference method can be used for county contracts exceeding $10,000 if this alternative is a "more feasible method of achieving" the MWBE utilization goal. Id. at § 4.18.060(C). Finally, in certain circumstances, all or portions of the MWBE program may be waived entirely. See id. at § 4.18.070(A) (waiver available where a non-MWBE is the sole source of a good or service, where no MWBE is available or competitively priced, and where the contract is awarded to certain governments or non-profit groups).
 
 
 6
 On September 28, 1989, bids were opened for a county contract to install guardrails along various county roads. Coral Construction Company ("Coral Construction"), an Oregon firm with a branch office in King County, was the low bidder at $178,100. However, utilizing the "percentage preference method," the County awarded the contract to Dirt & Aggregate Interchange, Inc. ("Dirt & Aggregate"), an Oregon-based MBE which submitted a bid of $185,153.50. Thereafter, Coral Construction and the Oregon-Columbia chapter of the Associated General Contractors of America, Inc. ("OCAGC"), brought this suit in the United States District Court for the Western District of Washington, alleging that King County's MWBE program, on its face and as applied to Coral Construction, violated the Constitution's equal protection clause and federal civil rights statutes, 42 U.S.C. §§ 1981 & 1983. Plaintiffs requested damages, injunctive and declaratory relief, and attorney's fees.
 
 
 7
 In the district court, both sides filed cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, each asserting that no disputed facts existed. On December 4, 1989, the district court granted King County's motion for summary judgment and denied the motion of Coral Construction and OCAGC. See Coral Construction Co. v. King County, 729 F.Supp. 734 (W.D.Wash.1989). The court concluded that King County's MWBE program was constitutional because the County had compiled a sufficient record of redressable discrimination against minorities and women, and had narrowly tailored its remedial measures.
 
 
 8
 Notwithstanding its victory in the district court, King County amended its MWBE program yet again. See King County, Wash., Ordinance 9609 (August 29, 1990). Specifically, the amendments, enacted on August 29, 1990, incorporated two consultant reports into the record underlying the MWBE program. The first study, prepared by Perkins Coie (and hereinafter referred to as the Perkins Coie Consultant Study), documents through statistics and anecdotal evidence the impact of discrimination in the local construction, architecture, and engineering fields. The second study, conducted by the Washington Consultant Group, focused on discrimination in the local goods and services industries. The two studies cost approximately $411,000 and were paid for by several local agencies. King County contributed $95,000.
 
 
 9
 The mechanics of the MWBE program were also altered by the August 29, 1990 amendments. The "percentage preference" method for allocating set-asides was modified; rather than using a fixed five-percent preference, a flexible-percentage preference was employed, the percentage to be determined on a case-by-case basis. In addition, under the amended version of the program, all prime contractors, even those that are themselves women- or minority-owned, are required to employ minority- and women-owned subcontractors, unless the prime contractor itself will perform twenty-five percent or more of the contract. Finally, the new ordinance requires the County's Office of Civil Rights and Compliance to monitor the effects of the MWBE program to ensure that it does not disproportionately favor a particular racial or ethnic group, and that it does not remain in force longer than is necessary to offset the effects of prior discrimination.
 
 
 10
 Coral Construction and OCAGC[4] appeal the district court's grant of summary judgment for King County. King County has moved for partial dismissal of this appeal, asserting that the plaintiffs' request for injunctive and declaratory relief is now moot as a result of the August 1990 amendments.
 
 
 11
 The district court had subject matter jurisdiction to hear this matter under 28 U.S.C. §§ 1331, 1343(a)(3), and 1343(a)(4). This court has jurisdiction under 28 U.S.C. § 1291. We review a grant of summary judgment de novo. See Columbia Pictures Indus. v. Professional Real Estate Investors, Inc., 866 F.2d 278, 279 (9th Cir.1989).
 
 II
 
 12
 We begin by examining the minority set-aside (MBE) component of King County's program. Coral Construction seeks damages, as well as injunctive and declaratory relief. To determine if Coral Construction is entitled to damages, we must review the ordinance as it existed at the time of Coral Construction's purported injury. Accordingly, we review the MBE program as amended on May 1, 1989, but prior to the August 29, 1990 amendments, for all purposes.
 
 
 13
 * In Croson, the Supreme Court definitively decided that a governmental actor's use of racial classifications, including classifications that appear to be facially benign, are subject to strict judicial scrutiny. Croson, 488 U.S. at 493, 109 S.Ct. at 720 (plurality); id. at 520, 109 S.Ct. at 735 (Scalia, J., concurring);[5] see also Cone Corp. v. Hillsborough County, 908 F.2d 908, 913 (11th Cir.) (hereinafter Hillsborough County) ("When reviewing the constitutionality of [an MBE], courts apply strict scrutiny," citing Croson), cert. denied, --- U.S. ----, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). Such strict scrutiny, in turn, has two elements: for an affirmative action program to survive such scrutiny, there must be a compelling governmental interest in employing a racial classification, and the classification must be narrowly tailored to achieve the compelling interest. Croson, 488 U.S. at 493-94, 109 S.Ct. at 720; see also Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality).
 
 
 14
 The Croson Court applied the strict scrutiny test to an MBE program very similar in purpose to that enacted by King County. Thus, the conclusions in Croson are dispositive as to many aspects of the King County program. There are, however, important substantive differences between the two programs. The Croson Court ruled upon a minority set-aside program that expired by its own terms months before its constitutionality was even argued in the Supreme Court. As a result of Croson's static posture, the Supreme Court failed to address many of the procedural accoutrements that necessarily accompany strict scrutiny review of such programs, particularly those programs, such as we are faced with here, whose vitality remains during the pendency of the judicial process. We shall review the merits of King County's MBE program with these differences in mind.
 
 B
 
 15
 We begin with the "compelling government interest" component of the strict scrutiny test.
 
 
 16
 * The Croson Court identified several factors suggesting the existence of a compelling governmental interest. First, a set-aside program is valid only if actual, identifiable discrimination has occurred within the local industry affected by the program. "A governmental actor cannot render race a legitimate proxy for a particular condition merely by declaring that the condition exists." Croson, 488 U.S. at 499-501, 109 S.Ct. at 725.
 
 
 17
 Second, the governmental actor enacting the set-aside program must have somehow perpetuated the discrimination to be remedied by the program. However, the governmental actor need not be an active perpetrator of such discrimination; passive participation will satisfy this sub-part of strict scrutiny review. See id. at 492, 109 S.Ct. at 720 (O'Connor, J., joined by Rehnquist, C.J., and White, J.). Mere infusion of tax dollars into a discriminatory industry may be sufficient governmental involvement to satisfy this prong. See id. ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice.").[6]2
 
 
 18
 As a threshold matter, Coral Construction contests King County's use of, and the district court's reliance upon, information compiled by the City of Seattle, the Port of Seattle, the Municipality of Metropolitan Seattle ("Metro"), and Pierce County, Washington. In Croson, the Supreme Court declared: "We have never approved the extrapolation of discrimination in one jurisdiction from the experience of another." 488 U.S. at 505, 109 S.Ct. at 727. This prohibition, Coral Construction reasons, requires the County to compile the record on its own; any sharing of data is strictly prohibited.
 
 
 19
 Resolution of this case requires a more searching inquiry into the reasons underlying the Supreme Court's statement. Data sharing presents the risk that data of "societal discrimination" will become the factual basis for an MBE program. This is impermissible. See id. at 496-97, 109 S.Ct. at 722-23 (plurality) (societal discrimination alone cannot justify race-conscious programs); id. at 526, 109 S.Ct. at 738 (Scalia, J., concurring in the judgment). Similarly, race-conscious programs must be designed to minimize--if not avoid--burdens upon nonculpable third parties. See United States v. Paradise, 480 U.S. 149, 183, 107 S.Ct. 1053, 1073, 94 L.Ed.2d 203 (1987) (plurality) (race-conscious decree "does not disproportionately harm the interests, or unnecessarily trammel the rights, of innocent individuals"). If an MBE program is based on outside data, it is possible that innocent third parties--residents of the jurisdiction covered by the program but not shown to have engaged in discriminatory activity--might be unnecessarily burdened.
 
 
 20
 Here, the City of Seattle, Port of Seattle, and Metro are either completely within or coterminous with the boundaries of King County. The data from these jurisdictions is, almost by definition, relevant to the question of discrimination within the County. Likewise, the risk of unfairly burdening innocent third parties is not present. Accordingly, the data from these three jurisdictions was properly considered by both the County and the district court.
 
 
 21
 In contrast, Pierce County is a completely separate jurisdiction from King County. It is, however, immediately adjacent to King County and is part of the same metropolitan area. Likewise, the world of contracting does not conform itself neatly to jurisdictional boundaries. In this regard, contracting differs markedly from a school system, which conducts its business in relative isolation from other school systems. Cf. Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). For these reasons, amici National Association for the Advancement of Colored People and the Northwest Women's Law Center argue that evidence of discrimination in Pierce County is indeed probative of discrimination within King County.
 
 
 22
 It is true that the Pierce County data has some probative value regarding discrimination within King County. Conversely, much of it is irrelevant. While some Pierce County developers and contractors undoubtedly seek business in both jurisdictions, many would not. It is vital that a race-conscious program align itself as closely to the scope of the problem legitimately sought to be rectified by the governmental entity. To prevent overbreadth, the enacting jurisdiction should limit its factual inquiry to the presence of discrimination within its own boundaries. Given the risk of unnecessary overlap, the district court properly excluded the Pierce County data from consideration.
 
 3
 
 23
 (a)
 
 
 24
 With or without the Pierce County data, Coral Construction contends that the record is insufficient to support King County's program. Undeniably, the record in the present case is considerably more extensive than that compiled by the Richmond City Council in Croson. In particular, the 700-plus page record contains the affidavits of at least 57 minority or women contractors, each of whom complains in varying degree of specificity about discrimination within the local construction industry. The affiants reflect a broad spectrum of the contracting community; the breakdown is roughly as follows:
 
 Black Contractors 23
 Hispanic Constractors 13
 Asian Contractors 10
 Native American Contractors 6
 Women Contractors[7] 3
 Other[8] 2
 
 25
 These affidavits certainly suggests that ongoing discrimination may be occurring in much of the King County business community. Many complain of being unable to obtain contracts for private sector work. Barbara H. Pool, president of Seaway Construction Inc. in Seattle, testified: "I believe the refusal of prime contractors, developers and architects to award contracts to my business for private sector work is due to discrimination against minority persons and minority-owned businesses generally." Likewise, David A. Zuluaga, president of D.A. Zuluaga Construction Inc. in Seattle, wrote:
 
 
 26
 "I have tried repeatedly in the past to obtain contracts and subcontracts on private construction contracts and have been unsuccessful. I know from my eleven years of experience in the construction industry that my businesses's prices are competitive with nonminority businesses' prices and that my business performs as high quality work as nonminority businesses. Nonetheless, when I have submitted bids to prime contractors for work on private projects or when I have attempted to negotiate contracts with these persons, I have been refused the right to participate in the projects.
 
 
 27
 The complaints extend to subcontracting awards on public projects. Mark W. Robison, president of Robison Construction Inc. in Auburn, Washington, averred: "We recently were in line to receive the site work contract for the King County Goodwill Games Pool Project, and were bypassed for a nonminority firm when King County relaxed their requirements for MBE participation." Similarly, Charles D. de Montigny, president of de Montigny Engineers Inc., declared that he has heard comments like "[t]here is no minority requirement on this project, so we are going to use someone else."[9]
 
 
 28
 Notably absent from the record, however, is any statistical data in support of the County's MBE program. The Supreme Court has suggested on several occasions that a statistical comparison is an invaluable tool with which to evaluate an affirmative action program. In International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), the Court stated:
 
 
 29
 [O]ur cases make it unmistakably clear that statistical analyses have served and will continue to serve an important role in cases in which the existence of discrimination is a disputed issue. We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish a prima facie case of racial discrimination in jury selection cases. Statistics are equally competent in proving employment discrimination.
 
 
 30
 Id. at 339, 97 S.Ct. at 1856 (citations, quotation, and footnote omitted). Indeed, the Court has held that, for purposes of Title VII, "[w]here gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination." Hazelwood School Dist. v. United States, 433 U.S. 299, 307-08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977); see also Croson, 488 U.S. at 501, 109 S.Ct. at 725 (same, quoting Hazelwood ). In decisions since International Brotherhood and Hazelwood, the Supreme Court has focused its attention on delineating the proper methods for interpreting statistical data. See, e.g., Bazemore v. Friday, 478 U.S. 385, 400, 106 S.Ct. 3000, 3008, 92 L.Ed.2d 315 (1986) (holding that, as a general rule, the failure to include variables in a regression analysis affects only the probativeness of the analysis, not its admissibility); Johnson v. Transportation Agency, 480 U.S. 616, 632, 107 S.Ct. 1442, 1452, 94 L.Ed.2d 615 (1987) (holding that where a job requires special training, appropriate statistical comparison should be with those in the labor force who possess the necessary qualifications); Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 650-51, 109 S.Ct. 2115, 2121-22, 104 L.Ed.2d 733 (1989) (holding that the proper statistical analysis is between the racial composition of qualified persons in the labor market and the persons holding the jobs at issue).
 
 
 31
 Of course, statistics, standing alone, must be analyzed carefully. See Forsberg v. Pacific Northwest Bell Tel. Co., 840 F.2d 1409, 1418 (9th Cir.1988). In International Brotherhood, the Supreme Court warned: "[S]tatistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." 431 U.S. at 340, 97 S.Ct. at 1856-57. Statistical evidence often does not fully account for the complex factors and motivations guiding employment decisions, many of which may be entirely race-neutral. Cf. Penk v. Oregon State Bd. of Higher Educ., 816 F.2d 458, 464-65 (9th Cir.), cert. denied, 484 U.S. 853, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987).
 
 
 32
 Unlike the cases resting exclusively upon statistical deviations to prove an equal protection violation, the record here contains a plethora of anecdotal evidence. However, anecdotal evidence, standing alone, suffers the same flaws as statistical evidence. Indeed, anecdotal evidence may even be less probative than statistical evidence in the context of proving discriminatory patterns or practices. While anecdotal evidence may suffice to prove individual claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination necessary for the adoption of an affirmative action plan. See Penk, 816 F.2d at 463-64.
 
 
 33
 Nonetheless, the combination of convincing anecdotal and statistical evidence is potent. In International Brotherhood, the Court conceded for purposes of argument that "statistics alone" could not support the finding of discrimination, but observed that "[t]he individuals who testified about their personal experiences with the company brought the cold numbers convincingly to life." 431 U.S. at 339, 97 S.Ct. at 1856. Similarly, the Eleventh Circuit, in passing upon a minority set-aside program similar to that here, concluded: "The testimony regarding ... complaints [of discrimination], combined with the gross statistical disparities uncovered by the County studies, provides more than enough evidence on the question of prior discrimination and need for racial classification to justify the denial of a motion for summary judgment." Hillsborough County, 908 F.2d 908 at 916.
 
 
 34
 Here, the MBE program cannot stand without a proper statistical foundation. Undoubtedly, the written testimony of the numerous affiants suggests that there may be a systemic discrimination within the King County construction industry. Without a statistical foundation, the picture is incomplete. Strict scrutiny demands a fuller story. Not enough has been told so far to meet King County's burden that its program passes the "compelling governmental interest" requirement.
 
 
 35
 (b)
 
 
 36
 King County contends that any deficiencies in the record, such as the lack of a statistical foundation, have been remedied by post-enactment studies. Specifically, King County urges us to consider the Perkins Coie Consultant Study completed in January 1990.[10] In addition, as an exhibit to its motion for partial dismissal on mootness grounds, King County attached a second consultant study prepared by the Washington Consulting Group and released in July 1990, although the County does not otherwise urge this study upon us. Coral Construction, on the other hand, contends that neither this court nor the district court should consider any post-enactment data purportedly supporting the MBE program.
 
 
 37
 Whether post-enactment studies may be considered in reviewing an MBE program is not simply a matter of appellate procedure but rather implicates the core of the pertinent equal protection analysis. The Croson Court noted that "a generalized assertion that there has been past discrimination in an entire industry provides no guidance for a legislative body to determine the precise scope of the injury it seeks to remedy." Croson, 488 U.S. at 498, 109 S.Ct. at 723 (majority). Similarly, we have observed that "[b]efore [a] city [may] embark[ ] on an affirmative action program, it must have convincing evidence that remedial action is warranted." Associated General Contractors v. City and County of San Francisco, 813 F.2d 922, 932 (9th Cir.1987). Relying on these statements, Coral Construction reasons that any post-enactment data is simply irrelevant. In so arguing, however, Coral Construction has collapsed two entirely independent inquiries into one.
 
 
 38
 It is true that a municipality must have some concrete evidence of discrimination in a particular industry before it may adopt a remedial program. See id.; see also Croson, 488 U.S. at 509, 109 S.Ct. at 729 (plurality) ("If the city of Richmond had evidence before it that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities, it could take action to end the discriminatory exclusion."). Race-based classifications must be reserved strictly for remedial settings. Croson, 488 U.S. at 493, 109 S.Ct. at 720 (plurality); id. at 524, 109 S.Ct. at 737 (Scalia, J., concurring in the judgment). Without any evidence of discrimination, it cannot be fairly said that the state is seeking to "remedy" a problem. Moreover, the benign nature of the classification is questionable where no evidence of discrimination has been adduced. Cf. id. at 493-96, 109 S.Ct. at 720-22 (plurality). Thus, any program adopted without some legitimate evidence of discrimination is presumptively invalid.
 
 
 39
 However, this requirement of some evidence does not mean that a program will be automatically struck down if the evidence before the municipality at the time of enactment does not completely fulfill both prongs of the strict scrutiny test. Rather, the factual predicate for the program should be evaluated based upon all evidence presented to the district court, whether such evidence was adduced before or after enactment of the MBE.
 
 
 40
 This rule--that a municipality have before it some evidence of discrimination before adopting a race-conscious program, while allowing post-adoption evidence to be considered in passing on the constitutionality of the program--is not an facile legal distinction. Rather, this rule recognizes the seemingly conflicting demands sometimes placed upon a state or municipality by the Constitution. "[T]he State has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself." Id. at 518, 109 S.Ct. at 734 (Kennedy, J., concurring) (emphasis added); see also Associated General Contractors, 813 F.2d at 929 ("a state or its political subdivision has the authority--indeed the constitutional duty--to ascertain whether it is denying its citizens equal protection of the laws and, if so, to take corrective steps") (emphasis in original; quotation and citations omitted). The remedy for intentional discrimination often calls for race-specific relief. See United States v. Paradise, 480 U.S. 149, 166, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality) ("It is now well established that governmental bodies, including courts, may constitutionally employ racial classifications essential to remedy unlawful treatment of racial or ethnic groups subject to discrimination."); Croson, 488 U.S. at 524, 109 S.Ct. at 737 (Scalia, J., concurring in the judgment). A state or municipality, when presented with evidence of its own culpability in fostering or furthering race discrimination, might well be remiss if it failed to act upon such evidence. Thus, a municipality having such evidence would face the dilemma of deciding whether to wait the months necessary for further development of the record, risking constitutional culpability due to its inaction, or to act and to risk liability for acting prematurely but otherwise justifiably. The rule we articulate today lessens the likelihood of such dilemmas.
 
 
 41
 This rule also comports with the Supreme Court's analysis set forth in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977) and Mount Healthy City School Dist. v. Doyle, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). In Arlington Heights, the Court concluded that proof that a zoning ordinance was motivated in part by a racially-discriminatory purpose would not necessarily require invalidation of the ordinance. Rather, such proof merely shifted the burden to the municipality to show that it would have enacted the ordinance in the absence of the improper purpose. 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21. Likewise, in Mount Healthy, the Court held that a public employee fired for, inter alia, exercising his first amendment rights did not have a cause of action for damages where the employer proved that the employee would have been terminated anyway. 429 U.S. at 285-86, 97 S.Ct. at 575. Here, our analysis is similar; we will not invalidate an MBE program due to an inadequate record where an adequate factual predicate is subsequently proven.
 
 
 42
 A race-conscious remedy without a race-based injury is constitutionally infirm. Croson, 488 U.S. at 499-502, 109 S.Ct. at 724-26 (majority). For this reason, a remedy without any evidence of a violation is presumptively void. However, where a state has a good faith reason to believe that systemic discrimination has occurred, and is continuing to occur, in a local industry, we will not strike down the program for inadequacy of the record if subsequent factfinding bears out the need for the program. In other words, a plan will not be invalidated solely because the record at time of enactment did not measure up to constitutional standards.[11]
 
 
 43
 (c)
 
 
 44
 Alternatively, Coral Construction argues that even if the consulting studies are relevant, this court should not consider them in the first instance. Rather, Coral Construction contends that it should first be given an opportunity to challenge the studies in the district court.
 
 
 45
 This point is well taken. As previously noted, statistics are not irrefutable, and may be rebutted. See International Brotherhood, 431 U.S. at 340, 97 S.Ct. at 1856. Such rebuttal comes in two guises. First, rebuttal evidence may consist of a neutral explanation for the statistical disparities. See Penk, 816 F.2d at 464. Also, the rebutting party may wish to attack the statistics themselves. This may be accomplished by (1) showing that the statistics are flawed; (2) demonstrating that the disparities shown by the statistics are not significant or actionable; or (3) presenting contrasting statistical data. Id. Coral Construction should have "its day in court" and the opportunity to attempt such a rebuttal. It would be inappropriate to consider the consultant studies for the first time on appeal. Since Coral Construction has not yet been accorded its opportunity for rebuttal before the trier of fact, we must reverse the grant of summary judgment to King County as to the MBE program.
 
 
 46
 We, therefore, remand this matter to the district court for determination of whether the consultant studies provide adequate factual justification to establish a "compelling government interest" for King County's adopting the MBE program.
 
 4
 
 47
 Coral Construction maintains that even if discrimination does exist within the King County business community, there is insufficient evidence of governmental involvement to warrant an MBE program. We disagree. Croson does not require a showing of active discrimination by the enacting agency; passive participation, such as the infusion of tax dollars into a discriminatory industry, suffices. Croson, 488 U.S. at 492, 109 S.Ct. at 720 (O'Connor, J., joined by Rehnquist, C.J., and White, J.) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."). In fact, the Croson Court concluded: "If the city of Richmond had evidence before it that non-minority contractors were systematically excluding minority businesses from subcontracting opportunities it could take action to end the discriminatory exclusion." Id. at 509, 109 S.Ct. at 729 (plurality). Here--assuming that the record adequately supports a finding of systemic discrimination--the County has adequately limited its program to those businesses that receive tax dollars; indeed, the program imposes obligations upon only those businesses which voluntarily seek King County tax dollars by contracting with the County.
 
 C
 
 48
 We turn next to the "narrow tailoring" prong of strict scrutiny review. We note at the outset that our analysis will necessarily be limited, given that the factual predicate for the program has not been fully developed or litigated before the district court. However, since Coral Construction may be entitled to judgment if the MBE program is constitutionally infirm in any manner, we shall conduct a brief examination of the program to determine if the program is flawed even before resort to the record is necessary.
 
 
 49
 The Supreme Court has identified several characteristics of a set-aside program which would suggest that a program was adequately restricted to remedying only prior discrimination within the jurisdiction. First, an MBE program should be instituted either after, or in conjunction with, race-neutral means of increasing minority business participation in public contracting. Id. at 507, 109 S.Ct. at 728 (majority). The second characteristic of a narrowly-tailored program is the use of minority utilization goals set on a case-by-case basis, rather than upon a system of rigid numerical quotas. See id. at 507-08, 109 S.Ct. at 728-29 (majority). Finally, an MBE program must be limited in its effective scope to the boundaries of the enacting jurisdiction. See id. at 491-92, 109 S.Ct. at 719-20 (O'Connor, J., joined by Rehnquist, C.J., and White, J.). Each of these characteristics will be considered in turn.
 
 
 50
 * Among the various narrow tailoring requirements, there is no doubt that consideration of race-neutral alternatives is among the most important. The reasons for this are numerous. First, race-neutral alternatives enable government to increase minority participation in an affected industry without a corresponding stigma. Id. at 493, 109 S.Ct. at 721 (plurality) ("Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility."); id. at 516-17, 109 S.Ct. at 733 (Stevens, J., concurring) ("Although [a race-based affirmative action program] stigmatizes the disadvantaged class with the unproven charge of past racial discrimination, it actually imposes a greater stigma on its supposed beneficiaries."). Many of the barriers to minority business participation are the product of factors other than race.[12] While there can be no doubt that one reason that minority-owned and operated construction firms tend to be less established than non-minority owned or operated firms is prior society-wide discrimination, many of the problems caused by the relative youth of minority-owned firms can be resolved without resorting to stigmatizing and fractionalizing racial classifications.
 
 
 51
 Likewise, a well-conceived race-neutral alternative ensures that the minority beneficiaries of the program are more likely to be the true victims of discrimination; such a program prevents a race-conscious program that merely acts as a windfall to previously established minority firms. See id. at 508, 109 S.Ct. at 729 (majority) ("Under Richmond's scheme, a successful black, Hispanic, or Oriental entrepreneur from anywhere in the country enjoys an absolute preference over other citizens based solely on their race.").
 
 
 52
 Nevertheless, while strict scrutiny requires serious, good faith consideration of race-neutral alternatives, strict scrutiny does not require exhaustion of every possible such alternative. We stated in Associated General Contractors that "[w]e ... read the admonition that only a 'limited and properly tailored remedy' may be adopted as requiring exhaustion of more neutral measures before resorting to race-conscious ones." 813 F.2d at 939 (citation and footnote omitted). However, we did not intend that a government entity exhaust every alternative, however irrational, costly, unreasonable, and unlikely to succeed such alternative might be. Indeed, the footnote immediately following this statement suggests that some degree of practicality is subsumed in the exhaustion requirement: "The [Human Rights Commission] report suggests that race-neutral measures can be effective.... Such measures also appear to be working well in Santa Clara, a community near San Francisco." Id. at 939 n. 36. Thus, Associated General Contractors requires only that a state exhaust race-neutral measures that the state is authorized to enact, and that have a reasonable possibility of being effective. Here, the record reveals that the County considered alternatives, but determined that they were not available as a matter of law. See Rev.Code of Wash. § 39.08.015 (restricting ability of counties to avoid bonding requirements); Wash. Const., art. 8, sec. 7 (prohibiting county or city from extending credit to businesses). The County cannot be required to engage in conduct that may be illegal; nor can it be compelled to expend precious tax dollars on projects where potential for success is marginal at best.[13]
 
 
 53
 Moreover, the record shows that King County has adopted some race-neutral measures in conjunction with the MBE program. For example, the County annually hosts one or two training sessions for small businesses, covering such topics as doing business with the government, small business management, and accounting techniques. In addition, the County provides information on accessing small business assistance programs. Inclusion of such race-neutral measures is one factor suggesting that an MBE plan is narrowly tailored. See Hillsborough County, 908 F.2d at 916 n. 11 ("While the Croson Court referred to these measures as alternatives to MBE plans, inclusion of such measures in an MBE plan would lend to the plan's flexibility."). King County has fulfilled its burden of considering race-neutral alternative programs.2
 
 
 54
 A second indicator of a program's narrow tailoring is program flexibility. An important means of achieving such flexibility is through use of case-by-case utilization goals, rather than rigid numerical quotas or goals. See Croson, 488 U.S. at 507-08, 109 S.Ct. at 728-29 (majority); see also Hillsborough County, 908 F.2d at 916-17. The Richmond program was fatally flawed because of its use of a rigid 30% quota for each city contract. See Croson, 488 U.S. at 507, 109 S.Ct. at 728. Such a quota "rests upon the 'completely unrealistic' assumption that minorities will choose a particular trade in lockstep proportion to their representation in the local population." Id. Case-by-case utilization goals are, however, "less problematic from an equal protection standpoint because they treat all candidates individually, rather than making the color of an applicant's skin the sole relevant consideration." Id. at 508, 109 S.Ct. at 728-29. Moreover, such individualized procedures insure that the beneficiaries of such preferential treatment are those "who truly have suffered the effects of prior discrimination." Id. Minority set-aside programs are not to be windfalls for otherwise successful minority contractors who have either overcome or otherwise not felt the sting of discrimination in the relevant locality.
 
 
 55
 In this respect, King County's program does not suffer from the rigidity that plagued the Richmond program. Under the "set-aside" method, the prescribed percentage of MBE subcontractor participation is determined individually on each contract according to the availability of qualified MBEs. See King County, Wash.Code § 4.18.060(A)(2)(a). The "percentage preference" method, used predominantly for contracts under $10,000, is simply not a quota, as no MBE will receive the relevant contract if its bid is not within the prescribed preference. While the preference is locked at five percent, such a fixed preference is not unduly rigid, particularly in light of the waiver provisions discussed below.
 
 
 56
 A valid MBE program should include a waiver system that accounts for both the availability of qualified MBEs and whether the qualified MBEs have suffered from the effects of past discrimination by the County or prime contractors. See Croson, 488 U.S. at 508. King County's program provides for waivers in both instances. See King County, Wash., Code § 4.18.070(A)(3) (waiver available where "neither a minority nor a women's business is available to provide needed goods or services"); id. at § 4.18.070(A)(5) (waiver available "[w]hen available minority and/or women's businesses have given price quotes which are unreasonably high in that they exceed competitive levels beyond amounts which can be attributed to cover costs inflated by the present effects of discrimination").
 
 
 57
 Similarly, in Hillsborough County, the Eleventh Circuit identified several other attributes of a narrowly tailored and flexible MBE. See 908 F.2d at 916-17. First, no goal could ever exceed fifty percent MBE participation. Id. Second, a low bidder who does not meet plan goals may nonetheless be awarded the contract by demonstrating a good faith effort to comply. Id. Finally, a low bidder may still receive a contract, even in the absence of good faith efforts to comply, if the next lowest bid is either $100,000 or fifteen percent higher than the low bid. Id.
 
 
 58
 King County's program mirrors that of Hillsborough County in many respects. As in Hillsborough County, not only are the actual percentages of required MBE participation determined on a case-by-case basis, but set-aside levels may be further reduced if the prescribed levels are not feasible, if qualified MBEs are unavailable, or if MBE price quotes are not competitive. King County, Wash.Code § 4.18.060(B). Complete waiver of set-aside requirements is permitted if a non-MBE is the sole source of a good or service, or if no MBE is otherwise available or competitively priced. Id. at § 4.18.070. Finally, when the preference method is employed, a non-MBE will be awarded the contract if it is the lowest bidder and no MBE is within five percent of the low bid. Id. at § 4.18.060(A)(1). King County's MBE program is not facially unconstitutional for want of flexibility.
 
 3
 
 59
 An MBE program must also be limited in its geographical scope to the boundaries of the enacting jurisdiction. "[A] state or local subdivision (if delegated the authority from the State) has the authority to eradicate the effects of private discrimination within its own legislative jurisdiction." Croson, 488 U.S. at 491-92, 109 S.Ct. at 720 (O'Connor, J., joined by Rehnquist, C.J., and White, J.); cf. id. at 524, 109 S.Ct. at 737 (Scalia, J., concurring in the judgment) ("In my view there is only one circumstance in which the States may act by race to 'undo the effects of past discrimination': where that is necessary to eliminate their own maintenance of a system of unlawful racial classification."). The task of remedying society-wide discrimination rests exclusively with Congress. See id. at 490, 109 S.Ct. at 719; see also Metro Broadcasting, Inc. v. FCC, --- U.S. ----, 110 S.Ct. 2997, 3008, 111 L.Ed.2d 445 (1990); Milwaukee County Pavers Ass'n v. Fiedler, 922 F.2d 419, 423-24 (7th Cir.) ("The joint lesson of Fullilove [v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) ] and Croson is that the federal government can, by virtue of the enforcement clause of the Fourteenth Amendment, engage in affirmative action with a freer hand than states and municipalities can do."), cert. denied, --- U.S. ----, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991).
 
 
 60
 King County's MBE program fails this third portion of the "narrow tailoring" requirement. The program's definition of "minority business" indicates that a minority-owned business may qualify for preferential treatment if the business has been discriminated against "in the particular geographical areas in which [it] operate[s]." See King County, Wash., Code § 4.18.010(S). This definition is overly broad. Since the County's interest is limited to the eradication of discrimination within King County, the only question that the County may ask is whether a business has been discriminated against in King County.
 
 
 61
 Thus, in the case at bar, it is of no moment that the successful bidder, Dirt & Aggregate, has its principal place of business in Troutdale, Oregon. The question is not one of business location, but of business participation. Indeed, an MBE headquartered in Seattle might not be eligible for preferential treatment, whereas a similar business located in Miami might. In order for an MBE to reap the benefits of King County's MBE program, it is necessary to determine if the company has ever been victimized by discrimination within King County.
 
 
 62
 This determination is not an insurmountable burden for the County, as the rule does not require a finding of specific instances of discriminatory exclusion for each MBE. Rather, if the County successfully proves malignant discrimination within the King County business community, an MBE would be presumptively eligible for relief if it had previously sought to do business in the County.[14] However, if the MBE was a newcomer to King County, or otherwise was untarnished by the systemic discriminatory practices, then it may not benefit from the MBE program. In other words, if systemic discrimination in the County is shown, then it is fair to presume that an MBE was victimized by the discrimination. For the presumption to attach to the MBE, however, it must be established that the MBE is, or attempted to become, an active participant in the County's business community. Since King County's program permits MBE participation even by MBEs who have no prior contact with King County, the program is overbroad to that extent.[15]
 
 
 63
 The grant of summary judgment to King County on the MBE program must be reversed on grounds of overbreadth as well.
 
 D
 
 64
 Having concluded that the MBE portion of the King County program (as it stood in September 1989) is constitutionally defective, at least in part, we must next determine whether our conclusions entitle Coral Construction to an award of damages. Coral Construction has pleaded two claims upon which such relief may be granted--42 U.S.C. § 1981 and 42 U.S.C. § 1983. We consider each in turn, beginning with section 1983.
 
 
 65
 * Section 1983 provides a private cause of action for deprivations of federal rights under color of state law. Meyerson v. State of Arizona, 709 F.2d 1235, 1238 (9th Cir.1983), vacated on other grounds, 465 U.S. 1095, 104 S.Ct. 1584, 80 L.Ed.2d 118 (1984). Section 1983 "was intended to create a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." Carey v. Piphus, 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978) (quotations omitted). Actions taken pursuant to a municipal ordinance are made "under color of state law" sufficient to trigger potential liability. See Monell v. Department of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978).
 
 
 66
 Of particular import here is section 1983's causation requirement. "[T]he basic purpose of a § 1983 damages award should be to compensate persons for injuries caused by the deprivation of constitutional rights...." Carey, 435 U.S. at 254, 98 S.Ct. at 1047. "[D]amages are available under that section for actions found to have been violative of constitutional rights and to have caused compensable injury." Id. at 255, 98 S.Ct. at 1047 (emphasis in original; quotation omitted); see also Mount Healthy City School Dist. v. Doyle, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (finding causation to be element of a claim for wrongful termination based upon exercise of first amendment rights).
 
 
 67
 Here, our review of King County's MBE program must be inconclusive. We have identified one specific provision of the program which is facially violative of the equal protection clause: the scope of King County's program covers a broader geographic scope than the County is authorized to consider. Nonetheless, we cannot determine whether this violation entitles Coral Construction to an award of damages, as the record does not indicate whether Coral Construction lost its bid to a business which King County should not have considered.
 
 2
 
 68
 Section 1981 provides, in part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens." Section 1981 differs from section 1983 in many important respects. First, section 1981's prohibitions extend to private citizens as well as to state actors. See Runyon v. McCrary, 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). Moreover, section 1981 actually proscribes certain conduct, whereas section 1983 is fundamentally a jurisdictional statute. In addition, section 1981 was founded upon the thirteenth, as well as the fourteenth, amendment, while the roots of section 1983 are found exclusively in the fourteenth. See Jett v. Dallas Independent School Dist., 491 U.S. 701, 721, 109 S.Ct. 2702, 2714, 105 L.Ed.2d 598 (1989).
 
 
 69
 However, like section 1983, section 1981 is by nature a tort remedy. Al-Khazraji v. St. Francis College, 784 F.2d 505, 518 (3d Cir.1986), aff'd on other grounds, 481 U.S. 604, 107 S.Ct. 2022, 95 L.Ed.2d 582 (1987). Accordingly, it follows that causation is also an element of a section 1981 cause of action. Even if section 1981's remedy is not perceived as tort-like, we nonetheless have little hesitation in finding a causation requirement in the statute. Rare indeed is the civil rights remedy without such a requirement. See, e.g., Mount Healthy City School Dist. v. Doyle, 429 U.S. 274, 285-86, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977) (in finding causation to be an essential part of a first amendment claim, Court observed that "[t]he constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct"); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.1987) (causation is part of a prima facie Title VII case). Thus, as with its section 1983 claim for relief, Coral Construction must show a causal link between the purported violation and its injury to recover damages under section 1981. Accordingly, the district court must resolve the question of causation on remand.
 
 E
 
 70
 A brief summary of our analysis and conclusions to this point may be helpful here. We have uncovered only one facial constitutional infirmity in the MBE program as it stood in September 1989: the program is geographically overbroad. However, we cannot say whether this facial infirmity should enable Coral Construction to recover damages, as the record is inadequate at present to determine whether this infirmity was the cause of Coral Construction's harm.
 
 
 71
 Nor are we persuaded that there exists a sufficiently "compelling governmental interest" to justify adoption of the County's race-conscious program. The record, as it existed in September 1989, does not support a finding of systemic discrimination within King County. Nonetheless, the subsequent consultant studies may--or may not--support such a finding. If the district court finds on remand that there was systemic discrimination within the King County business community, then the district court may go on to consider any additional questions of "narrow tailoring" that might arise from the expanded record.
 
 III
 
 72
 We turn next to Coral Construction's request for injunctive and declaratory relief regarding the MBE program. This, of course, requires us to consider King County's motion for partial dismissal of this appeal. King County contends that as a result of the August 29, 1990, amendments to the MWBE program, Coral Construction's request for declaratory and injunctive relief is moot. In opposition to King County's motion, Coral Construction claims that the 1990 amendments addressed only a few of its numerous objections to the MWBE program, that the amendments are in any event cosmetic, and finally, that the amendments have not "completely and irrevocably eradicated the effects" of the alleged constitutional violation. See County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (case is moot if there is no reasonable expectation that alleged violation will recur, and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation).
 
 
 73
 Ordinarily, a contention of mootness must be resolved as a threshold matter, since the court would lack jurisdiction to decide a moot case. See Koppers Indus. v. EPA, 902 F.2d 756, 758 (9th Cir.1990). However, in cases involving the amendment or repeal of a statute or ordinance, mootness is "a matter relating to the exercise rather than the existence of judicial power." Carreras v. City of Anaheim, 768 F.2d 1039, 1047 (9th Cir.1985) (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982)). Simply put, mootness here is not a jurisdictional issue; rather, we may continue to exercise authority over a purportedly moot case where the balance of interests favors such continued authority.[16] The party moving for dismissal on mootness grounds bears a heavy burden. Halet v. Wend Investment Co., 672 F.2d 1305, 1308 (9th Cir.1982). Moreover, voluntary cessation of allegedly illegal conduct, standing alone, does not necessarily render a case moot. See, e.g., City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982).
 
 
 74
 One factor to consider in deciding if a case is moot as a result of subsequent statutory amendments is whether the governmental entity is likely to reenact the offending provision. See Barilla v. Ervin, 886 F.2d 1514, 1521 (9th Cir.1989). However, even if the government is unlikely to reenact the provision, a case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the provision. See City of Mesquite, 455 U.S. at 289 n. 10, 102 S.Ct. at 1075 n. 10 (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). This principle is illustrated by City of Mesquite and Carreras. In each of these two cases, the district court had enjoined, at least in part, the challenged ordinance. Nonetheless, the Supreme Court noted in City of Mesquite that the defendants could "reenact[ ] precisely the same provision if the District Court's judgment were vacated," id. (footnote omitted), even though in so doing the city would be acting with the knowledge that its ordinance had been previously enjoined. Here--unlike City of Mesquite or Carreras--the district court approved of the County's ordinance. Thus, not only could the County reenact its earlier ordinance, but it could do so without the spectre of a prior finding of unconstitutionality. This factor weighs against mootness.
 
 
 75
 We thus decline to dismiss any part of this case as moot. However, we also decline to address the merits of Coral Construction's arguments. Ordinarily, when a plaintiff seeks to enjoin application of an ordinance, statute or other law, we would review the district court's holding "in light of [the] law as it now stands, not as it stood when the judgment below was entered." Diffenderfer v. Central Baptist Church, 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972) (per curiam); see also Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1249 (4th Cir.1991) (reviewing Maryland's MBE program as subsequently amended, citing Diffenderfer). However, given the unique procedural posture of this case, it would be premature to consider the present version of the ordinance prior to a ruling on the earlier version of the ordinance. We leave the question of the amended program's constitutionality--and the corresponding question of the continued necessity for injunctive or declaratory relief--to the district court for determination on remand. See Carreras, 768 F.2d at 1047 n. 19.
 
 IV
 
 76
 Finally, we consider the gender-specific aspect (WBE) of the set-aside program. We note in passing that since the prior harm alleged by Coral Construction was a result of the MBE aspect of the MWBE program, rather than the WBE component, the only relief sought by Coral Construction regarding the WBE program is prospective or declaratory. Accordingly, we consider the program as it presently exists, rather than as it stood when the district court entered judgment. See Diffenderfer, 404 U.S. at 414, 92 S.Ct. at 575.
 
 
 77
 * We first consider Coral Construction's standing to challenge the WBE program. King County has not questioned the standing of either Coral Construction or OCAGC to challenge the gender-based preference. However, since standing is a jurisdictional issue, see Coakley v. Sunn, 895 F.2d 604, 606 (9th Cir.1990), we may consider it nostra sponte, see Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc., 898 F.2d 1393, 1399 (9th Cir.1990); see also Donaghy v. City of Omaha, 933 F.2d 1448, 1455 (8th Cir.1991) (federal courts are "under an independent obligation" to establish whether a person has standing to challenge an affirmative action program).
 
 
 78
 Article III of the United States Constitution requires that a plaintiff allege personal injury that is fairly traceable to the defendant's purportedly unlawful conduct, and that the requested relief is likely to redress the injury. Coakley, 895 F.2d at 606. "That is, the litigant must allege a distinct and palpable injury to himself; that the injury is somehow directly linked to the challenged activity; and the injury is one which is apt to be redressed by a remedy that the court is prepared to give." Id. Here, we consider whether Coral Construction has alleged a "distinct and palpable injury." See generally Cone Corp. v. Florida Dep't of Transp., 921 F.2d 1190 (11th Cir.) (hereinafter Department of Transportation) (discussing injury element of standing as applied to a challenge to an MBE program) cert. denied, --- U.S. ----, 111 S.Ct. 2238, 114 L.Ed.2d 479 (1991).
 
 
 79
 Where only injunctive or declaratory relief is sought, a plaintiff must show "a very significant possibility" of future harm in order to have standing to bring suit. See Nelsen v. King County, 895 F.2d 1248, 1250 (9th Cir.1990). "The complainant must allege an injury to himself that is distinct and palpable, as opposed to merely abstract, and the alleged harm must be actual or imminent, not conjectural or hypothetical." Whitmore v. Arkansas, 495 U.S. 149, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (citations omitted). Moreover, "[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." Id.
 
 
 80
 Indeed, one court has held in a setting similar to the present case that a majority-owned contractor lacked standing to seek injunctive or declaratory relief regarding an MBE. See Department of Transp., 921 F.2d at 1210. In Department of Transportation, the Eleventh Circuit considered Cone Corporation's challenge to an MBE program administered by the Florida Department of Transportation. The plaintiffs alleged that they had lost work as a result of the MBE program. However, the Eleventh Circuit observed that the plaintiffs "alleged no facts ... to support this allegation; that is, they did not point to any specific contract they lost because the Secretary discriminated against them on account of their race." Id. at 1205-06 (footnote omitted). Likewise, "[t]he plaintiffs' allegations of future injury suffered the same infirmity; the plaintiffs merely concluded that, because of the Secretary's DBE requirements, 'they will be injured in their business or property.' " Id. The court concluded that these "bald conclusions" were insufficient to give rise to standing, and that the court would "decline to imagine an injury sufficient to give the plaintiffs standing when they have demonstrated none." Id. at 1210.
 
 
 81
 At first blush, one might suspect that Coral Construction's complaint suffers the same standing infirmities as that in Department of Transportation, in respect to its challenge of the WBE aspect of the set-aside program. Coral Construction has not pointed to a contract lost to a woman-owned business. Moreover, the chain of events that would lead to injury here initially appears to be too speculative to give rise to standing--Coral Construction would have to bid for another King County project, the project would have to be awarded to a woman-owned subcontractor, and Coral Construction would have to be the lowest bidder. See id. at 1201-04.
 
 
 82
 However, further analysis reveals the fallacy of such logic. In its amended complaint, Coral Construction alleges that "it intends to bid public contracts to be let by the defendant in the future." Unlike Department of Transportation, this conclusion is adequately supported by factual allegations within the complaint. Coral Construction has a branch office in King County. Coral Construction specializes in guardrail installation, highway signing, and related work, all of which is virtually the exclusive domain of public agencies. It is highly probable that Coral Construction will again bid on work let by King County.
 
 
 83
 This alone, however, is insufficient to confer standing upon Coral Construction. Coral Construction must also demonstrate imminent economic injury. See S.J. Groves & Sons Co. v. Fulton County, 920 F.2d 752, 758 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991). While we conclude that Coral Construction will undoubtedly continue to bid on County projects, to presume that the company will be the low bidder but lose the project to a WBE is too speculative to confer standing. See Department of Transp., 921 F.2d at 1205-06. The question is whether Coral Construction has alleged a more certain injury than a potential lost bid.
 
 
 84
 Coral Construction alleges that "because it is not a member of the race or gender classes granted preference by the Ordinance and Chapter 4.18, it is not and will not be permitted to have its bid for such contracts considered on the same basis as those of the race and gender classes granted preferences by such provisions." In S.J. Groves, the Eleventh Circuit rejected such a claim as a basis for standing. 920 F.2d at 758. However, in so holding the court observed that "Groves is able to compete with other bidders on an equal basis," id. (emphasis in original); the MBE set-aside applied equally to all bidders. Here, this is not the case. Under the 1989 version of the WBE program, majority contractors did not enjoy an equal playing field for contracts awarded under the set-aside method, as WBE contractors were exempt from the subcontractor set-aside requirements. Perhaps more significantly, under the County program and unlike that in S.J. Groves, contracts to be awarded under the preference method entitled WBEs to an automatic five percent competitive advantage.
 
 
 85
 As a result of the objectively unequal bidding process under the preference method of awarding contracts, an injury results not only when Coral Construction actually loses a bid, but every time the company simply places a bid. Indeed, Coral Construction suffers injury for standing purposes even when it is the successful bidder, as it must adjust its bid to reflect the fixed five-percent adjustment given to WBEs. Each bid placed by the company undoubtedly reflects the unequal competition.
 
 
 86
 Coral Construction has standing to challenge the WBE program.[17]
 
 B
 
 87
 As a second threshold matter, we must determine the degree of judicial scrutiny afforded gender-conscious programs. In Associated General Contractors, we employed intermediate scrutiny, see 813 F.2d at 939, under which gender classifications are reviewed to ensure that they are substantially related to important governmental objectives, see City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 441, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). However, Coral Construction urges us to adopt strict scrutiny, the same standard of review applied to race-conscious programs.
 
 
 88
 We are bound by prior decisions of our court unless the prior panel's decision is "clearly inconsistent with subsequent Supreme Court decisions." Sheehan v. United States, 896 F.2d 1168, 1172 n. 7 (9th Cir.), amended, 917 F.2d 424 (1990). The Croson Court, of course, considered only an MBE set-aside program. However, the Court's plurality concluded its opinion by noting:
 
 
 89
 If there is no duty to attempt either to measure the recovery by the wrong or to distribute that recovery within the injured class in an evenhanded way, our history will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate "a piece of the action" for its members.
 
 
 90
 Croson, 488 U.S. at 510-11, 109 S.Ct. at 730 (quoting Fullilove v. Klutznick, 448 U.S. 448, 539, 100 S.Ct. 2758, 2806, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting)). Relying on this passage, Coral Construction contends that gender-based preferences should be subject to as stringent a review as those based on race.
 
 
 91
 Coral Construction bolsters its argument by noting that another circuit apparently has changed its degree of scrutiny as a result of Croson. In Michigan Road Builders Ass'n v. Milliken, 834 F.2d 583 (6th Cir.1987), aff'd, 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), the Sixth Circuit employed intermediate scrutiny to review a WBE program, citing our holding in Associated General Contractors. However, two years later and following Croson, the same court seemingly applied strict scrutiny when considering a gender-based affirmative action program. See Conlin v. Blanchard, 890 F.2d 811, 816 (6th Cir.1989) ("In order for a race or sex based remedial measure to withstand scrutiny under the fourteenth amendment there must first be some showing of prior discrimination by the governmental entity involved, and second, the remedy adopted by the state must be tailored narrowly to achieve the goal of righting the prior discrimination."). Coral Construction urges us to follow the Sixth Circuit's lead.[18]
 
 
 92
 Finally, Coral Construction refers us to the critique of intermediate scrutiny found in Contractors Ass'n of Eastern Pennsylvania v. City of Philadelphia, 735 F.Supp. 1274, 1302-03 (E.D.Pa.1990). There, the court identified several problems with the intermediate scrutiny standard. First, the court suggested that a lesser standard of review gives undue deference to legislative bodies to fashion remedies for past wrongs, a task better suited for the judiciary. Id. at 1302. Second, this lesser standard makes it easier for a legislature to enact gender-based relief over race-based relief, even though blacks have suffered more egregious discrimination over time. Id. Finally, the court noted that application of intermediate scrutiny "provides 'relatively little guidance in individual cases.' " Id. (quoting Associated General Contractors, 813 F.2d at 939).
 
 
 93
 We are cognizant of the problems with intermediate scrutiny. See Associated General Contractors, 813 F.2d at 939-42. Nonetheless, such standard of review remains the law of this circuit, if not of the land; certainly Associated General Contractors cannot be said to be "clearly inconsistent" with Croson on this matter. Contractors Association is telling in one other aspect. Despite the litany of problems it found with intermediate scrutiny, the court applied intermediate scrutiny nonetheless. See id. at 1304.[19] Accordingly, we find ourselves powerless to overrule Associated General Contractors on this point, even if we were so inclined. Thus, we shall employ intermediate scrutiny to review King County's WBE program.
 
 C
 
 94
 Under intermediate scrutiny, a gender-based classification must serve an important governmental objective, and there must be a direct, substantial relationship between the objective and the means chosen to accomplish the objective. Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). In the context of WBE preferences, the two prongs of this intermediate scrutiny test tend to converge into one.
 
 
 95
 A governmental entity "may invoke a compensatory purpose to justify a discriminatory classification 'only if members of the gender benefited by the classification actually suffer a disadvantage related to the classification.' " Associated General Contractors, 813 F.2d at 940 (quoting Weinberger v. Wiesenfeld, 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975)). "[I]f the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate." Hogan, 458 U.S. at 725, 102 S.Ct. at 3336.
 
 
 96
 However, the mere recitation of a benign, compensatory purpose will not automatically shield a gender-specific program from constitutional scrutiny. See Califano v. Webster, 430 U.S. 313, 317, 97 S.Ct. 1192, 1194, 51 L.Ed.2d 360 (1977) (quoting Weinberger v. Wiesenfeld, 420 U.S. 636, 648, 95 S.Ct. 1225, 1233, 43 L.Ed.2d 514 (1975)). "The notion that women need help in every business and profession is as pernicious and offensive as its converse, that women ought to be excluded from all enterprises because their place is in the home." Associated General Contractors, 813 F.2d at 941. Some degree of discrimination must have occurred in a particular field before a gender-specific remedy may be instituted in that field. See Hogan, 458 U.S. at 729, 102 S.Ct. at 3338 (striking down a woman-only state-sponsored nursing school, where state "made no showing that women lacked opportunities to obtain training in the field of nursing or to attain positions of leadership in that field").
 
 
 97
 Unlike the strict standard of review applied to race-conscious programs, intermediate scrutiny does not require any showing of governmental involvement, active or passive, in the discrimination it seeks to remedy. In Associated General Contractors, we observed that the "[g]overnment has the broad power to assure that physical differences between men and women are not translated into permanent handicaps, and that they do not serve as a subterfuge for those who would exclude women from participating fully in our economic system." 813 F.2d at 940. Similarly, in Webster the Supreme Court observed that "[r]eduction of the disparity in economic condition between men and women caused by the long history of discrimination against women has been recognized as such an important governmental objective." 430 U.S. at 317, 97 S.Ct. at 1194. But see Michigan Road Builders, 834 F.2d at 595 ("WBE preferences ... cannot withstand constitutional attack since evidence of record that the state discriminated against women is nonexistent.").
 
 
 98
 In Associated General Contractors, we applied these principles to San Francisco's WBE preference program. Remedying disadvantages women faced in the marketplace, we concluded, was an important and legitimate concern. 813 F.2d at 941. We were, however, troubled by the preference's sweeping scope. "The ordinance," we observed, "is unusual in the breadth of the subsidy it gives to women"; indeed, the program subsidized WBEs in virtually every industry in which San Francisco contracted, including industries for which there was no reason to believe that women were disadvantaged. See id.
 
 
 99
 Nonetheless, we concluded that the program survived a facial challenge. "Although the city's program may extend preferences to some fields where women are not disadvantaged, experience suggests that these are still the exceptions." Id. at 942. In accordance with Hogan, however, we left the door open to industry-specific challenges: "We may reach a different conclusion if and when the WBE preferences are challenged as applied to an industry where women are not disadvantaged." Id.
 
 
 100
 In the present case, we conclude, as we did in Associated General Contractors, that King County's WBE preference survives a facial challenge. Like San Francisco, King County has a legitimate and important interest in remedying the many disadvantages that confront women business owners. Moreover, the means chosen are substantially related to the objective. The utilization goals under both the set-aside and preference methods are legitimate means of furthering the objective, and are not unduly onerous. Similarly, while King County's program, like that in San Francisco, gives preference to women in all industries contracting with the County, this alone is insufficient to warrant invalidating the entire program. See id. at 941-42.
 
 
 101
 On the record presently before us, an industry-specific challenge must also fail. The record adequately indicates discrimination against women in the King County construction industry. Particularly telling is the twenty-two-page affidavit of Anne C. Symonds, president of the consulting engineering firm of Anne Symonds & Associates, Inc. For the years 1985-87, Symonds noted that less than seven percent of the firm's business came from private contracts; most of the firm's work resulted from gender-based set-asides. Additionally, Symonds observed that, to the best of her knowledge, her firm, established in 1980, was the first woman-owned engineering firm in the state of Washington. Symonds averred that she has attempted to obtain more private contract work, but has been unsuccessful. She attributed her lack of success to the "discriminatory attitude toward me and towards women and minority businesses generally."
 
 
 102
 The district court properly granted summary judgment to King County as to the WBE portion of its set-aside program.
 
 V
 
 103
 Coral Construction seeks an award of attorney's fees under 42 U.S.C. § 1988, which permits the award of attorney's fees to a prevailing party under several specified civil rights statutes, including sections 1981 and 1983. By its own terms, that section provides that a party must "prevail" to be eligible for recovery of attorney's fees. See Hanrahan v. Hampton, 446 U.S. 754, 756, 100 S.Ct. 1987, 1988, 64 L.Ed.2d 670 (1980). As a general rule, a party who obtains the reversal of judgment on appeal is not a "prevailing party" unless such reversal also resulted in entry of judgment for that party. See id. at 757-59, 100 S.Ct. at 1989-90. No such judgment has yet been entered here. Accordingly, an award of attorney's fees at this time would be premature.
 
 VI
 
 104
 For the foregoing reasons, the district court's grant of summary judgment for King County is reversed as to the MBE portion of the set-aside program. On remand, the district court should determine whether the MBE program, as it existed in September 1989, meets the "compelling governmental interest" requirement in light of the additional factual support offered by the County. The district court shall also consider whether there is a causal link between the program's geographic overbreadth and Coral Construction's injury. If either of these questions is answered in the affirmative, Coral Construction would be entitled to judgment and an award of damages.
 
 
 105
 We leave the issue of the continued jurisdiction over Coral Construction's requests for injunctive and declaratory relief to the sound discretion of the district court.
 
 
 106
 As to the WBE portion of the set-aside program, the district court's grant of summary judgment for King County is affirmed.
 
 
 107
 Parties will bear their own costs.
 
 
 108
 AFFIRMED IN PART, REVERSED IN PART, and REMANDED.
 
 
 
 [1]
 Minority-owned and women-owned businesses are referred to collectively as "MWBEs."
 
 
 [2]
 Contracts coming within the program's purview include architectural and engineering contracts, concession contracts, construction contracts, consultant contracts, and purchasing and service contracts. See King County, Wash., Code ch. 4.18.030
 
 
 [3]
 As will be noted later, the ordinance was again amended on August 29, 1990. Unless otherwise specified, references to the county ordinance are to the pre-1990 version of the ordinance
 
 
 [4]
 Hereinafter the two plaintiffs will be referred to collectively as "Coral Construction."
 
 
 [5]
 The number of Justices joining Justice O'Connor's opinion in Croson varied from part to part. Five Justices joined parts I, IIIB, and IV of the opinion; hereinafter, these sections shall be designated as "majority." Justice O'Connor garnered four Justices for parts IIIA and V; these sections shall be referred to as "plurality." Finally, three Justices joined part II of the opinion; citation to this part of the opinion shall so reflect
 
 
 [6]
 In Associated General Contractors v. City and County of San Francisco, 813 F.2d 922 (9th Cir.1987), we held that "[a]t a minimum, the state or local government must be acting to remedy government-imposed discrimination, perpetuated by it or by one of its departments or divisions." Id. at 930 (footnote omitted). We agree with the district court that Croson implicitly overruled--or, at the very least, construed broadly--this portion of Associated General Contractors. See 729 F.Supp. at 737-38
 
 
 [7]
 The record contains far more than three affiants from women-owned contractors; however, many of the other women were also minority, and attributed any hostility to race-based factors
 
 
 [8]
 One individual hailed from the country of India, and another identified himself only as a "minority."
 
 
 [9]
 It is worthy of note that the MBE program may be having some of its desired effects. Mr. de Montigny averred:
 There is a general perception that minority firms don't really know what they are doing. However, the MBE set-asides have made some progress in that area. I have had some repeat customers as a result of my first contract being a minority set-aside.
 
 
 [10]
 The study was submitted to the district court four days prior to the hearing on the parties' cross-motions for summary judgment. The court expressly did not consider the study in upholding King County's program. 729 F.Supp. at 737 n. 4
 
 
 [11]
 Of course, the municipality that adopts such a program without a complete record bears the risk that a fuller development of the facts will not support the need for the program, or that the program might not be narrowly tailored
 
 
 [12]
 In fact, many of the barriers facing minority businesses are typical of those facing any entrepreneur whose business is in its infancy. We note in passing that to the extent that the sole barrier to minority business participation is that faced by all new businesses, regardless of ownership, an MBE program cannot stand. Only upon a showing of actual discrimination may a state or municipality enact a race-based remedial program
 
 
 [13]
 Coral Construction faults King County for failing to lobby the state legislature to amend or repeal section 39.08.015. This criticism is meritless. A legislative entity considering an MBE program is only required to exhaust race-neutral alternatives that are legitimately within the authority of the entity to enact. Pleading with superior legislative bodies for expanded authority is not such a required alternative
 
 
 [14]
 We use the word 'presumptively' advisedly, for we do not wish to foreclose the possibility that the presumption might be overcome in a proper case
 
 
 [15]
 The majority in Croson did object to the Richmond plan because, among other things, "there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors." 488 U.S. at 508, 109 S.Ct. at 729 (majority). However, we do not believe that the Court meant to say that the inquiry must be more specific than what we have outlined here
 
 
 [16]
 That Coral Construction has sought damages does not alter our analysis. Obviously, Coral Construction's request for damages remains a live controversy. Cf. Croson, 488 U.S. at 478 n. 1, 109 S.Ct. at 713 n. 1 ("The expiration of the ordinance has not rendered the controversy between the city and Croson moot. There remains a live controversy between the parties over whether Richmond's refusal to award Croson a contract pursuant to the ordinance was unlawful and thus entitles Croson to damages."). Nonetheless, damage claims may be parsed from requests for injunctive or declaratory relief for purposes of mootness analysis. See Wilson v. Nevada, 666 F.2d 378, 383 (9th Cir.1982)
 
 
 [17]
 Because Coral Construction has standing, we need not determine whether OCAGC has associational standing. See Pennell v. City of San Jose, 485 U.S. 1, 8 n. 4, 108 S.Ct. 849, 855 n. 4, 99 L.Ed.2d 1 (1988) (concluding that since association had standing, giving Court jurisdiction, it was unnecessary to determine whether the individual litigant also had standing)
 
 
 [18]
 At least one other court has seemingly applied strict scrutiny to a gender-conscious program. See American Subcontractors Ass'n v. City of Atlanta, 259 Ga. 14, 376 S.E.2d 662, 664 (1989)
 
 
 [19]
 In addition, intermediate scrutiny may not be as irrational as the Contractors Association Court suggested. The Seventh Circuit recently noted that "it can be argued that if sex discrimination is not so serious a wrong as racial discrimination we need not worry about confining its use to the remedial setting." Milwaukee County Pavers Ass'n v. Fiedler, 922 F.2d 419, 422 (7th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 2261, 114 L.Ed.2d 714 (1991)