**J. Jack BRAS, individually and doing business as J. Jack Bras & Associates, Plaintiff–Appellant,**

v.

**CALIFORNIA PUBLIC UTILITIES COMMISSION, Defendant–Appellee.**

No. 93–15764.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 13, 1994.

Decided July 5, 1995.

Pamela A. Lewis, Schneider & Wallerstein, San Jose, CA, for plaintiff-appellant.

Timothy E. Treacy, Public Utilities Com'n of the State of Cal., San Francisco, for defendant-appellee.

Before: WALLACE, Chief Judge, PREGERSON and BEEZER, Circuit Judges.

Opinion by Chief Judge WALLACE; Dissent by Judge PREGERSON.

WALLACE, Chief Judge:

Bras appeals from the district court's summary judgment in favor of the California Public Utilities Commission (Commission), dismissing his equal protection claims for lack of standing. · We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291. We reverse and remand.

I

From 1969 to 1991, Bras provided architectural services to Pacific Bell. Approximately 30 percent of Bras's gross receipts after 1983 came from work generated by Pacific Bell. On February 1, 1991, Bras was asked to complete a "prequalification criteria" form. The form was to be used by Pacific Bell to select a group of architectural firms to submit proposals and, if selected, to enter into "improved business partnerships." Question 10 on the form asked: "[A]re you currently certified through the Cordoba Corporation Clearing House process for Minority/Women Business Enterprise status?" Bras completed the form, answering question 10 in the negative, and returned the form to Pacific Bell on February 4, 1991.

In June 1991, Bras was informed by Pacific Bell that a business decision was made to work closely with a small number of suppliers in the San Francisco Bay Area and to develop working relationships with those firms over a period of time. Bras was told that Pacific Bell chose these suppliers based on the information contained in the "prequalification criteria" form that Bras completed. Bras was also informed that 13 architectural firms had completed the forms, that Bras ranked sixth amongst all of those firms, that Pacific Bell initiated negotiations with the top three ranked firms, and that Bras would have ranked third instead of sixth had question 10 not been considered. In fact, however, Pacific Bell gave ten points for answering question 10 with a "yes" and zero points for answering question 10 with a "no." The firm that finished third in the ranking was a minority-owned business.

In response to Bras's inquiries concerning the selection process and the reason why he was eliminated from consideration for an "improved business partnership," a representative of Pacific Bell wrote to Bras, stating: "I would like to assure you that your firm was very competitive and was not eliminated due to any unsatisfactory performance.... Again, I appreciate your interest and the many contributions to our business. We plan to maintain your information on file and will be happy to consider Bras & Associates when our contract for architectural services is re-evaluated in the future."

On January 10, 1992, Bras filed this action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985 against Pacific Bell and the Commission. Bras alleged that Pacific Bell discriminated against him on the basis of race and sex in violation of the Equal Protection Clause of the United States Constitution. Bras also charged that sections 8281–8286 of the California Public Utilities Code (Code) and the Commission's General Order 156 (Order) are unconstitutional and should be declared void, and sought a permanent injunction forbidding the Commission from implementing these provisions.

For many years, the Commission has overseen programs to increase the participation of minority-owned and women-owned businesses in public utility contracting. Before 1986, the Commission simply required public utilities to maintain public outreach programs which encouraged and assisted minority-owned and women-owned businesses to compete for contracts with public utilities. In 1986, however, the California Legislature passed the Women and Minority Business Enterprise Law, which is codified at sections 8281–8286 of the Code.

Section 8283(a) requires "each electrical, gas, and telephone corporation with gross annual revenues exceeding twenty-five million dollars ... to submit annually, a detailed

and verifiable plan for increasing women, minority, and disabled veteran business enterprise procurement in all categories." Cal. Pub.Util.Code § 8283(a) (West 1993). A "minority business enterprise" is one where at least 51% of the enterprise is owned by a minority group or groups. *Id.* § 8282(b). Utilities are required by the Code to "presume that minority includes Black Americans, Hispanic Americans, Native Americans, and Asian Pacific Americans." *Id.* The Code also requires that annual plans be submitted by utilities that include "short- and long-term goals and timetables, but not quotas, and ... methods for encouraging both prime contractors and grantees to engage women, minority, and disabled veteran business enterprises in subcontracts." *Id.* § 8283(b). The Commission is directed to "establish guidelines" to help utilities establish programs pursuant to the Minority Business Enterprises section of the Code. *Id.* § 8283(c).

Pursuant to Code § 8283(c), the Commission implemented the Order, which requires utilities to set "substantial and verifiable short-term (one year), mid-term (three years), and long-term (five years) goals for the utilization of" minority businesses. *Id.* § 8. It specifically directs that "[e]ach utility shall establish initial minimum long-term goals for each major category of products and services the utility purchases from outside vendors of not less than 15% for minority owned business enterprises and not less than 5% for women owned business enterprises." *Id.* § 8.2. A "goal" is defined as a "target which when achieved, indicates progress in a preferred direction. A goal is neither a requirement nor a quota." *Id.* § 1.3.13. Although a utility cannot automatically be sanctioned solely for failing to meet goals, the Commission may, after conducting an investigation, sanction a utility for failing to make acceptable progress in the hiring of minority businesses. *Id.* § 8.12. The Commission concedes that it could sanction a utility by reducing its rate of return.

Bras settled all of his claims against Pacific Bell. On November 25, 1992, the settlement agreement was placed under seal by the district court. Bras's only remaining claims are for declaratory and injunctive relief against the Commission. The district court dismissed these claims for lack of standing.

## II

We review the district court's summary judgment de novo. *First Pacific Bank v. Gilleran,* 40 F.3d 1023, 1024 (9th Cir.1994). Our role is to determine whether, viewing the evidence in the light most favorable to the nonmoving party, there is a genuine issue of material fact for trial and whether the district court correctly applied the law. *Id.* We may affirm on any ground supported by the record even if it differs from that of the district court. *Id.*

There are three requirements for Article III standing: (1) injury in fact, which means an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, which means that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, which means that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (*Lujan*). The party invoking federal jurisdiction bears the burden of establishing each of these elements. *Id.* "Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Id.* In order to defeat a summary judgment motion, the nonmoving party may not simply rely on his pleadings but must present some evidence on every material issue for which he will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Thus, Bras will defeat summary judgment if he has present-

ed some evidence establishing each of the three requirements for Article III standing.

## III

■ The Commission contends that Bras failed to meet the "injury in fact" requirement because he has not demonstrated the loss of any future business. The Commission argues that there is no evidence that Bras intends in the future to bid on work for Pacific Bell or any other public utility subject to the Code or Order, and that Bras has, in any event, been excluded from consideration by Pacific Bell as a result of the settlement.

■ Because Bras seeks declaratory and injunctive relief only, it is insufficient for him to demonstrate that he was injured in the past; he must instead show a very significant possibility of future harm in order to have standing. *Coral Construction v. King County*, 941 F.2d 910, 929 (9th Cir.1991) (*Coral Construction*), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992).

■ In both *Coral Construction* and *Associated General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401 (9th Cir.1991) (*Associated General*), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992), we concluded that contractors had standing to challenge programs that gave preferences to minority- and women-owned businesses for public contract awards. The programs essentially gave minority- and women-owned businesses a 5% bidding preference. In other words, the lowest bid would be accepted unless a minority- or women-owned business was within 5% of the bid price. *See Coral Construction*, 941 F.2d at 914; *Associated General*, 950 F.2d at 1404. In both cases, we concluded that the plaintiffs did not have to prove that they would lose any bids or identifiable contracts in order to sustain actual injury. We explained in *Coral Construction* that "[a]s a result of the objectively unequal bidding process under the preference method of awarding contracts, an injury results not only when Coral Construction actually loses a bid, but every time the company simply places a bid." 941 F.2d at 930. Similarly, in *Associated General* we stated: "the mere fact that [As-

sociated General] members cannot play on an even field against [Minority Business Enterprises] subjects them to a legally cognizable injury." 950 F.2d at 1407. Under *Coral Construction* and *Associated General*, plaintiffs alleging equal protection violations need not demonstrate that rigid quotas make it impossible for them to compete for any given benefit. Rather, they need only show that they are forced to compete on an unequal basis.

The Supreme Court recently adopted our analysis of the injury in fact requirement as it applies in equal protection cases in *Northeastern Florida Contractors v. City of Jacksonville*, —— U.S. ——, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (*Northeastern Florida*). The Supreme Court stated:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.* at ——, 113 S.Ct. at 2303. Under *Northeastern Florida*, Bras need only demonstrate that he is "able and ready to bid on contracts and that a discriminatory policy prevents [him] from doing so on an equal basis." *Id.*

We conclude that Bras has met this burden. Bras's complaint and summary judgment declaration do not assert that he presently intends to submit bids to Pacific Bell. However, Bras cannot presently "bid" on future projects for Pacific Bell because Pacific Bell has entered into long-term business relationships with three architects that are now used for all of its architectural service needs. Bras can, however, fill out a new qualification form when the three-year term of Pacific Bell's present business relationships expires. That Bras can only compete for long-term contracts every several years rather than on a project-by-project basis does not change the analysis.

Bras states in his summary judgment declaration, which was subsequent to his settlement with Pacific Bell, that: "I *earnestly desire* to reinstate my long term business relationship with Pacific Bell ... in the future *and stand ready, willing and able* to provide such services should I be given an opportunity to do so." (Emphasis added.) Bras also submitted a letter from Pacific Bell indicating that Pacific Bell was pleased with his past work, would keep his information on file, and would consider him when it reevaluates its needs. This evidence is sufficient to establish, for purposes of summary judgment, that Bras will suffer future injury if the program is not enjoined.

■ In deciding whether Bras has standing, we must consider the allegations of fact contained in Bras's declaration and other affidavits in support of his assertion of standing. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1974) (*Warth*). We are required to view the evidence in the light most favorable to Bras because we are reviewing a summary judgment entered against him on the basis of lack of standing. *Fors v. Lehman*, 741 F.2d 1130, 1132 (9th Cir.1984); *see also Warth*, 422 U.S. at 501, 95 S.Ct. at 2206 (when addressing motion to dismiss for lack of standing, both district court and court of appeals must accept as true all material allegations of the complaint and must construe the complaint in favor of the party claiming standing). Thus, we must presume that Bras's declaration is truthful and that he is willing, ready, and able to do work for Pacific Bell in the future should he be given the opportunity. Nothing in the record indicates that this is not so. Viewing the evidence in the light most favorable to Bras, we must also accept as true the evidence in the record that Pacific Bell was satisfied with Bras's past performance and that it promised to keep his information on file and to consider him when Pacific Bell reevaluates its needs. This evidence shows that there will be future competitions to provide architectural services to Pacific Bell and that Bras will be eligible to participate. There is no evidence in the record indicating that the settlement with Pacific Bell prevents Bras from competing for future contracts. Moreover, Bras would have been one of the

three firms considered for work by Pacific Bell had Pacific Bell not been forced to implement a Minority Business Enterprise program under the Code and Order. Given all of this evidence, we cannot assume that Bras would suffer no future injury by the ongoing implementation of the program. To the contrary, viewed in the light most favorable to Bras, the evidence indicates that there is a significant likelihood that he will suffer future injury if the program is not enjoined.

## IV

■ The Commission further contends that Bras lacks standing because the Code and Order do not themselves contain any race or gender specific discriminatory devices such as preferences or set-asides pursuant to which Bras could be denied equal treatment. Although the Commission couches this argument in terms of the "injury in fact" requirement, this argument implicates not only the "injury in fact" requirement but also the interrelated requirements that there be a causal relationship between the injury and the challenged conduct and that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 559, 112 S.Ct. at 2136.

The Code and Order are not immunized from scrutiny because they purport to establish "goals" rather than "quotas." We look to the economic realities of the program rather than the label attached to it. During the pendency of the *Northeastern Florida* litigation, a new ordinance was adopted that "established 'participation goals' ranging from 5 to 16% ... [and] provides not one but five alternative methods for achieving the 'participation goals.'" *Northeastern Florida*, —— U.S. at ——, 113 S.Ct. at 2300. Nevertheless, the Court explained that the replacement of the old statute with the new one did not make the case moot, because "[t]he gravamen of petitioner's complaint is that its members are disadvantaged in their efforts to obtain city contracts. The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it accords preferential treatment to black- and female-owned contractors ... it disadvantages them in the same fundamental way." *Id.* at ——,

113 S.Ct. at 2301. The ordinance at issue in *Northeastern Florida* did not *require* the use of set-asides, it merely authorized them. The Code and Order at issue here do nothing less. As *Northeastern Florida* shows, the relevant question is not whether a statute "requires" the use of such measures, but whether it authorizes or encourages them.

Other circuits, both prior to and since *Northeastern Florida,* have also concluded that the label attached to the program does not change the standing analysis. In *Concrete Works of Colorado v. Denver,* 36 F.3d 1513 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995), the Tenth Circuit concluded that a nonminority prime contractor had standing to challenge a Denver ordinance that established "goals" for minority participation in city projects. The ordinance in *Concrete Works* directed the Office of Contract Compliance "to establish goals, on a project-by-project basis, for the participation level of [Minority and Women Business Enterprises] in city projects." *Id.* at 1516. Project goals were not required for every project, and project goals were often set at levels below the annual goals level. A prime contractor owned by a white male brought an action seeking both damages and injunctive relief. The Tenth Circuit correctly explained that "so long as the nonminority contractor can show that it was 'able and ready to bid' on a contract subject to the ordinance, the requisite 'injury in fact' under Article III arises from an inability to 'compete [with minority contractors] on an equal footing' due to that ordinance's discriminatory policy." *Id.* at 1518, *citing Northeastern Florida,* —— U.S. at ——, 113 S.Ct. at 2303. *Concrete Works* further supports the conclusion that a program that establishes "goals" rather than rigid "quotas" can still cause "injury in fact." *See also Adarand Constructors v. Pena,* 63 U.S.L.W. 4523 (U.S. June 12, 1995) (nonminority subcontractor has standing to challenge the validity of a federal program pursuant to which prime contractors for highway projects were given an additional 1% of the bid price if the contractor met relevant "goals" for the hiring of minority subcontractors); *Harrison & Burrowes Bridge Constructors v. Cuomo,* 981 F.2d 50 (2d Cir.1992)

(nonminority prime contractor had standing to challenge a state program requiring prime contractors to submit a "utilization plan" outlining the participation of minority- and women-owned businesses and requiring such contractors to make "good faith efforts" to comply with project "goals" established by the contracting agency).

We are also unmoved by the Commission's argument that the Code and Order do not require public utilities to adopt discriminatory programs. While the Code and Order do not expressly state that public utilities must adopt any particular programs such as bidding preferences or set-asides, they clearly have the practical effect of requiring them to do so.

The Order requires utilities to establish "substantial and verifiable" short-term, medium-term, and long-term goals, and to set a minimum initial long-term "goal" of purchasing at least 15% of each major category of products and services from minority-owned businesses and 5% from women-owned businesses. The Commission also monitors each utility's "progress" and can sanction a utility for failing to make acceptable progress by reducing its rate of return. Considering that the utilities already had nondiscriminatory outreach programs in place to encourage and assist minority- and women-owned businesses to compete for contracts before the adoption of the Code and Order, the clear message sent to the utilities by their adoption may have been that racially neutral outreach programs were insufficient. Because the Code and Order effectively encourage, if not compel, Pacific Bell to adopt discriminatory programs, there is a sufficient nexus between Bras's injury and the Commission's actions in enforcing the Code and implementing the Order.

V

We express no opinion as to whether the Code or Order discriminates against Bras on the basis of race or gender. All we hold is that he has standing to raise the claims. Bras, like any person alleging discrimination, must satisfy no less or more than what Article III requires. We conclude that Bras has

satisfied his burden of showing injury in fact and that he has standing to seek declaratory and injunctive relief against the Commission.

REVERSED AND REMANDED.

PREGERSON, Circuit Judge, dissenting:

As a plaintiff who seeks injunctive or declaratory relief, Jack Bras "must show 'a very significant possibility' of future harm in order to have standing to bring suit." *Coral Construction Co. v. King County*, 941 F.2d 910, 929 (9th Cir.1991) (quoting *Nelsen v. King County*, 895 F.2d 1248, 1250 (9th Cir. 1990)), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 875, 116 L.Ed.2d 780 (1992). Because Bras cannot demonstrate future harm caused by the actions of the California Public Utilities Commission ("Commission"), I dissent.

The majority relies on *Northeastern Fla. Gen. Contractors v. Jacksonville*, —— U.S. ——, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993), for its contention that Bras, who settled with Pacific Bell, has standing in his lawsuit against the Commission to challenge provisions—General Order 156 ("Order") and Cal.Pub.Util.Code § 8283 ("Code")—that require contractors to establish goals for women and minority participation in California public contracting. The original Jacksonville ordinance at issue in *Northeastern*, —— U.S. at ——, 113 S.Ct. at 2303, provided that 10 percent of the amount spent each year on city contracts be set aside for minority or women businesses. After the Supreme Court granted certiorari, Jacksonville repealed the ordinance and replaced it. The new ordinance set goals for minority and women contractor participation and specified five methods for achieving those goals. The city decided which method it would use on a contract by contract basis. One of the methods, the "Sheltered Market Plan," was a " 'set-aside' by another name," which allowed the city to reserve contracts for the exclusive competition of minority and women businesses. *Id.* at ——, 113 S.Ct. at 2301. The Court held that "when the government erects a barrier" that gives one group an advantage in obtaining a benefit, someone not in that group seeking to challenge that barrier does not need to allege that he or she would have obtained the benefit but for the barrier. The

Court reasoned that the "injury in fact" in that type of an equal protection case is the denial of equal treatment, not the ultimate inability to obtain the benefit. *Id.* at ——, 113 S.Ct. at 2303.

*Northeastern* does not support the majority's position that Bras has standing in this action against the Commission. First, Bras cannot prove an "injury in fact." He cannot show a "very significant" possibility of future injury because any possibility of injury is too speculative to warrant judicial scrutiny. Further, because the Code and Order do not "erect[ ] a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group," *id.*, the provisions do not disadvantage Bras. Second, Bras cannot fulfill another requirement of standing, the necessary causal nexus between his alleged injury and the defendant's conduct.

I.

Bras's future injury is too "hypothetical" to warrant judicial review. *United Public Workers of America v. Mitchell*, 330 U.S. 75, 90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947). First, and most important, there are no current Pacific Bell projects on which Bras can bid. The majority notes that Pacific Bell has already entered into three-year contracts with several architects. The first time Bras will have a chance even to apply to be a candidate for an "improved business relationship" is at the end of Pacific Bell's *three year cycle.*

In contrast, the regular bidding process in *Northeastern* meant that the contractors would bid, and therefore be injured, again in the very near future. In *Northeastern*, the Supreme Court found that "[i]n its complaint, petitioner alleged that its members regularly bid on construction contracts in Jacksonville, and that they would have bid on contracts set aside pursuant to the city's ordinance were they so able." *Northeastern*, —— U.S. at ——, 113 S.Ct. at 2304. In fact, the Court distinguished an earlier Supreme Court case, *Warth v. Seldin*, 422 U.S. 490, 516, 95 S.Ct. 2197, 2214, 45 L.Ed.2d 343 (1975), on this basis. The Court explained, that unlike the

contractors in *Northeastern,* the plaintiffs in *Warth* did not have standing because they did not allege that any contractor "ha[d] applied ... for a building permit or a variance with respect to any *current* project." *Northeastern,* —— U.S. at ——, 113 S.Ct. at 2304 (emphasis added) (quoting *Warth,* 422 U.S. at 516, 95 S.Ct. at 2214). The Court concluded that, unlike the petitioner in *Warth,* the contractors in *Northeastern* alleged an injury of "sufficient immediacy" to warrant standing. *Id.* (quoting *Warth,* 422 U.S. at 516, 95 S.Ct. at 2214).

Here no Pacific Bell project is "currently proposed," and Bras cannot show an injury of "sufficient immediacy." *Id.* (quoting *Warth,* 422 U.S. at 516, 95 S.Ct. at 2214). A delay of three years makes Bras's alleged injury unreasonably abstract. And because Bras did not allege that he planned to work with any other utility, his relationship with Pacific Bell is all we can evaluate. In short, Bras's alleged injury is not "actual or imminent," as it must be to form the basis for standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990)).

Moreover, Bras's future intentions are unclear. As the district court noted, Bras made no statement in his complaint that he intends to bid for future contracts from any public utility. His only statement to that effect came after he settled with Pacific Bell. In his declaration in support of his motion for summary judgment, Bras stated that he "earnestly desire[s]" to reinstate his long term business relationship with Pacific Bell and is "ready" and "able" to provide architectural services if he is given "the opportunity to do so." [E.R. 57] But Bras does not say that he *will apply* for another long term contract with Pacific Bell, and he does not specify *when* he will apply. In the context of an ongoing bidding process, contractors need only allege that they are "ready" and "able" to bid, because their regular conduct is sufficient evidence of their future intentions. *Northeastern,* —— U.S. at ——, 113 S.Ct. at 2303. Without such a process, however, these words are insufficient. Plaintiffs, like

Bras, must allege "concrete" plans and specify when they will expose themselves to injury again. *Lujan,* 504 U.S. at 564, 112 S.Ct. at 2138 (holding that plaintiffs who had no "current" or "concrete" plans to visit site where injury to them would occur did not have standing).

Last, Bras has failed to present any evidence to suggest that Pacific Bell would consider hiring him again after settling his claims. The majority refers to a letter Bras received from Pacific Bell, indicating that it would "maintain [his] information on file," [E.R. 119], but the opinion fails to note that Pacific Bell sent that letter *before* the parties reached a settlement. Thus, Bras has not shown an injury of "sufficient immediacy and ripeness to warrant judicial intervention." *Northeastern,* —— U.S. at ——, 113 S.Ct. at 2304 (quoting *Warth,* 422 U.S. at 516, 95 S.Ct. at 2214).

## II.

Even if Bras could demonstrate that he would be in a position in the future to be injured by the Code and Order, he would not be able to prove "a very significant possibility" of future harm, *Coral Construction,* 941 F.2d at 929 (quoting *Nelsen,* 895 F.2d at 1250), because the challenged Code and Order in the instant case have not "erect[ed] a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group." *Northeastern,* —— U.S. at ——, 113 S.Ct. at 2303.

The challenged measures are different in critical ways from Jacksonville's program in *Northeastern.* The Supreme Court based its holding in *Northeastern* expressly on the fact that the Jacksonville ordinance contained a set-aside program. The Court noted that "in the context of a challenge to a set-aside program, the 'injury-in-fact' is the inability to compete on an equal footing in the bidding process...." *Id.* Therefore, the Court concluded, "a party challenging a *set-aside program like Jacksonville's* need only demonstrate that it is able and ready to bid on contracts and that a *discriminatory policy* prevents it from doing so on an equal basis." *Id.* (emphasis added). The Code and Order do not foreclose competition on an "equal

footing," and they do not constitute a "discriminatory policy." The provisions themselves only require that utilities set goals, and "[a] goal is neither a requirement nor a quota." Cal.Pub.Util.Code § 1.3.13. Therefore, Bras cannot show that the Code or Order will injure him.

The majority's contention, that the measures at issue are similar to the program in *Northeastern* because both "authorize" the use of set-asides but do not require them, is specious. First, in *Northeastern*, the set-aside program was an explicit option which the defendant, the *city itself*, could employ at any given time. In contrast, the defendant here, the Commission, does not operate any procurement programs whatsoever, discriminatory or otherwise. Second, nothing in the language of the Code or Order alludes to any type of set-aside scheme. The Supreme Court in *Northeastern*, —— U.S. at ——, 113 S.Ct. at 2303, based its conclusion on the fact that set-asides were an explicit option under the city ordinance. The contested measures here involve no preferences or quotas. They do not dictate the use of any particular programs and do not themselves constitute a program. They do not deny Bras, or anyone, equal treatment. In the instant case, unlike in *Northeastern*, the "government" has not "erect[ed] a barrier." *Id.*

Attempting to draw a further parallel to *Northeastern*, the majority states that "[w]hile the Code and Order do not expressly state that public utilities must adopt any particular programs such as bidding preferences or set-asides, they clearly have the practical effect of requiring them to do so." The majority cites no evidence to support this conclusion, nor could it, as none exists in the record. Utilities are not "required" to adopt any particular scheme, only goals. Neither the Code nor the Order specify how those goals should be met nor even dictate that they be met. Utilities are free to adopt completely gender and race-neutral schemes. For example, a program that aided inexperienced contractors with the bidding process might have the effect of achieving the Code and Order goal of increasing women and minority participation in procurement while treating all inexperienced contractors, white

and minority, men and women, exactly alike. Moreover, the criteria for successful bidders remain unchanged and are entirely race and gender neutral. If Bras were to participate under such a program, he would suffer no equal protection harm.

If Bras wanted to challenge a particular race or gender-conscious program, one that might "make it more difficult for members of one group to obtain a benefit than it is for members of another group," *id.*, he could bring an action against the utility that developed the program. But no utility is a defendant in this action; Bras settled all his claims with Pacific Bell and has not questioned any other utility's contracting policy. Bras's suit against the Commission only challenges the Order and the Code, measures that mandate goals alone.

### III.

In addition to lacking a constitutionally adequate "injury in fact," Bras cannot prove a sufficient causal nexus between the contested measures and his injury. In other words, an injury must be "fairly ... trace[able] to the challenged action of the defendant...." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136.

The majority attempts to gloss over this issue by stating that "[b]ecause the Code and Order effectively encourage, if not compel, Pacific Bell to adopt discriminatory programs, there is a sufficient nexus between Bras's injury and the Commission's actions in enforcing the Code and implementing the Order." This conclusion is unsupportable. The Code and the Order do nothing more than to require utilities to set goals for hiring women and minority contractors. The provisions do not imply or suggest, and certainly do not compel utilities to use discriminatory programs.

The majority theorizes that because some utilities may have had nondiscriminatory outreach programs in place before the Code and Order were adopted, the "clear message" the Code and Order "may have sent" is that those programs were insufficient. The majority offers no legislative history, case law, affidavits nor any other evidence to support the majority's conjecture. Just as plausible

an explanation is that the legislature wanted the utilities to direct their already sufficient efforts toward specific goals.

Bras is challenging the actions of the Commission. The Commission's actions are not discriminatory, and there is not a sufficient nexus between the state's provisions and any future injury that Bras may incur from a utility's specific program. Just as in *Allen v. Wright,* 468 U.S. 737, 759, 104 S.Ct. 3315, 3329, 82 L.Ed.2d 556 (1984), in which minority parents challenged the IRS's failure to deny tax-exempt status to discriminatory schools, here also the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak for the chain as a whole to sustain ... standing." In *Allen,* the Court noted that the minority children's inability to receive an integrated education was related only by way of intermediary parties, the private discriminatory schools, and speculative reasoning as to the effect of the prevailing decisions. *Id.* at 758–59, 104 S.Ct. at 3328. The same is true here. Bras's future injury, if any, would be traceable to the contracting process of a utility, which very well may not be a product of the provisions he now challenges, and would not necessarily be changed if the Code and Order were struck down. *See also Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 42–43, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976) (hospitals' denial of care to indigent patients not fairly traceable to IRS ruling regarding hospitals' charitable corporation tax status).

## IV.

The likelihood of future injury in the instant case is far too remote to meet established constitutional standards. Standing is founded "in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth,* 422 U.S. at 498, 95 S.Ct. at 2205. When an individual seeks to avail himself of the federal courts to determine the validity of a legislative action, he must show that he "is immediately in danger of sustaining a direct injury." *Ex parte Levitt,* 302 U.S. 633, 634, 58 S.Ct. 1, 1, 82 L.Ed. 493 (1937). This requirement is necessary to ensure that "federal courts reserve their judicial power for 'concrete legal issues, presented in actual cases, not abstractions.'" *Associated General Contractors of California v. Coalition for Economic Equity,* 950 F.2d 1401, 1406 (9th Cir.1991) (quoting *United Public Workers,* 330 U.S. at 89, 67 S.Ct. at 564), *cert. denied,* 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992). Bras offers us a hypothetical injury, abstract in nature. We should not exceed our judicial authority by holding that he has standing.